# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

DONALD SCHMIDTMANN,

                              Plaintiff,

       v.                                    6:13-CV-1415
                                                (TJM/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

STEPHEN J. MASTAITIS, ESQ., for Plaintiff
DAVID L. BROWN, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

     This matter was referred to me for report and recommendation by the Honorable

Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b)

and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

     On March 17, 2011, plaintiff filed an application for Social Security Disability

Insurance Benefits ("DIB"), alleging disability, beginning May 19, 1993, due to

bulging discs in his back, diabetes mellitus, loss of sight in his left eye, and diabetic

neuropathy. (Administrative Transcript ("T.") 123-29, 151). Plaintiff's application was

initially denied on June 16, 2011. (T. 71). Plaintiff requested a hearing which was held

on May 8, 2012 before Administrative Law Judge ("ALJ") Mary Sparks. Plaintiff and a

vocational expert ("VE") testified at the hearing. (T. 31-70). ALJ Sparks denied the

application in a decision issued on July 20, 2012 (T. 11-25), which became the final

decision of the Commissioner when the Appeals Council ("AC") denied plaintiff's request for review on October 24, 2013 (T. 1-6).

## II. GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner

2

will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.   ISSUES IN CONTENTION

Plaintiff raises the following arguments:

(1)   The ALJ failed to properly credit the opinion of plaintiff's treating physician. (Pl.'s Br. at 9-15) (Dkt. No. 16).

(2)   The ALJ erred in failing to hold a supplemental hearing based on the VE's new information, and the AC erred in failing to remand for a supplemental hearing based on "new and material" evidence, submitted by Dr. John Ioia, M.D., Ph.D. (Pl.'s Br. at 15-16, 25-26).

(3)   The ALJ erred in determining plaintiff's residual functional capacity ("RFC"). (Pl.'s Br. at 16-25).

(4)     The ALJ failed to properly consider plaintiff's obesity.[1]

Defendant argues that the Commissioner's decision is supported by substantial evidence. This court agrees, for the reasons set forth below, and recommends that the ALJ's decision be affirmed and the complaint dismissed.

## IV.    FACTS

Plaintiff's counsel has included a statement of facts in his brief, citing mostly to plaintiff's testimony at the hearing. (Pl.'s Br. at 2-8). Defense counsel has incorporated, into his brief, the ALJ's statement of facts, which discusses more of the medical evidence than the plaintiff's brief covers. (Def.'s Br. at 2, incorporating T. 13-25). The court will adopt the facts stated in plaintiff's brief, together with the facts as stated by the ALJ, with any exceptions as noted in the discussion below.

Complicating the consideration of this case is the fact that the relevant time period under consideration is from May 19, 1993 (when plaintiff alleges that his disability began) to June 30, 1996 (when plaintiff's insured status expired). There is no dispute that plaintiff must show that he was disabled on or before June 30, 1996. Plaintiff's subsequent condition is not relevant, except to the extent that it is probative of his condition prior to the expiration of his insured status.

## V.    THE ALJ'S DECISION

At step two of the disability determination, the ALJ found that, prior to June 30, 1996, plaintiff had the following severe impairments: (1) mild to moderate degenerative

---

[1] The plaintiff did not include this as a separate argument, but the defendant has considered it separately, and the court will also do so. To facilitate my analysis, the court will address the issues in this case in a different order than they were raised by plaintiff.

changes of the dorsal spine; (2) mild degenerative changes of the lumbar spine; (3)

diabetes mellitus; and (4) possible mild diabetic peripheral neuropathy. (T. 13-17). The

ALJ found that plaintiff's hearing impairment was not severe, even though plaintiff had

a five percent hearing loss in 1991 due to a work related injury in 1989. (*Id.*) The ALJ

found that the hearing problem had "resolved." (*Id.*) The ALJ also found that on

November 6, 1996, plaintiff's "vision was overall better," and that on January 4, 1999

(long after the expiration of insured status), it was noted that plaintiff had diabetic

retinopathy for which he underwent laser surgery and was "doing better." (T. 17).

Finally, the ALJ found that although plaintiff claimed that he had arthritis in his hands,

the medical records prior to June of 1996 did not show any such complaints, nor did the

records document any difficulty using his fingers. (*Id.*)

At step three of the disability evaluation, the ALJ found that plaintiff's

impairments did not, alone, or in combination, meet the severity of a Listed Impairment.

(T. 17-18). In making this determination, the ALJ compared plaintiff's impairments to

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04 (Disorders of the Spine). The objective

evidence prior to the expiration of plaintiff's insured status showed only mild to

moderate degenerative spondylosis in the areas of T10, 11, and 12, with some

osteophyte formation. (T. 17). The October 30, 1991 myelogram of the lumbar spine

was "essentially negative," with only mild bulging at L3-L4 and L4-L5. The October

30, 1991 CT scan of the cervical spine revealed only mild bulging at C3-C4 and C5-C6.

(*Id.*)

The ALJ did note that the tests performed in 2009 showed much more serious

changes in plaintiff's spine. (*Id.*) The ALJ also mentioned the EMG and nerve studies taken of plaintiff's upper extremities in 2009, showing, *inter alia*, ulnar neuropathy. There was no objective evidence of active cervical spine radiculopathy. (T. 18) (citing Ex. 8F, T. 256).

The ALJ also considered plaintiff's obesity, and found it to be a "medically determinable impairment." However, the ALJ concluded that the plaintiff had no work-related limitations due to obesity prior to June 30, 1996, and he had no difficulty walking, pursuant to Social Security Ruling ("SSR") 02-1p, 2002 WL 34686281 .[2] (T. 18).

At step four, ALJ Sparks found that plaintiff had the RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently. (T. 18). He could sit for six hours; and he could stand and/or walk a total of four hours in an eight hour day, as long as he had the ability to sit or stand at will, and provided that he was not "off task" more than 10% of the work day. (T. 18). Plaintiff could never climb ladders, ropes, or scaffolds. He could occasionally climb ramps or stairs, and he could occasionally stoop, crouch, kneel, or crawl. (*Id.*)

The ALJ outlined plaintiff's testimony about his symptoms and limitations in and before 1996, including his claims of restricted activities; blurry vision; use of a back brace; problems with balance/falling due to the diabetic neuropathy; inability to sleep for more than a couple of hours per night; and problems with his temper. (T. 19). The

---

[2] As discussed below, the listing for obesity was eliminated in 2002, and an SSR was issued to explain how obesity was to be evaluated in the disability process.

ALJ found that plaintiff had medically determinable impairments that could reasonably have caused the symptoms alleged, but found that plaintiff's complaints about the intensity and limiting effect of his pain and other symptoms in and before 1996 were not credible, to the extent inconsistent with the ALJ's RFC determination. (*Id.*)

The ALJ found that plaintiff's testimony at the hearing was inconsistent with what he had told his primary care physician, Dr. Diamond, prior to, and after the expiration of his insured status. (*See e.g.,* T. 19-20). For example, plaintiff told Dr. Diamond in August of 1994, that plaintiff fell "while shoveling his neighbor's ice," but testified at the hearing that, prior to June of 1996, he could not tie his shoes, button his shirt, or even bathe, due to arthritis in his hands. (T. 19). The ALJ also noted that, as late as 2006 and 2009, plaintiff was a volunteer fireman. (T. 19). Plaintiff testified about pain in his lumbar spine during the insured period; but in March of 1996, plaintiff only complained of pain in his neck and a decreased range of motion in his thoracic spine. (T. 21). The ALJ also noted that on March 22, 2011, cardiologist Dr. Snider noted that plaintiff was having shortness of breath, palpitations, chest tightness, and pain "while shoveling snow this winter." (T. 19). However, cardiac tests resulted in normal findings. (*Id.*)

The ALJ considered the conclusion of treating physician, Peter F. Diamond, D.O., that plaintiff could not work and would never be able to work; but the ALJ gave that opinion "no weight." (T. 22, 224). The ALJ stated that Dr. Diamond's medical records prior to June 30, 1996 showed no evidence of significant peripheral neuropathy as a result of the diabetes. On June 16, 1993, Dr. Diamond stated that the claimant's

back and neck were "status quo." Plaintiff was "still stiff," but he was walking two miles per day. (T. 23). The ALJ stated that the plaintiff's degree of pain was inconsistent with the objective findings, which, during the relevant time period, showed only mild disc bulging at L3-4; L4-5. (*Id.*) Dr. Diamond referred plaintiff to Dr. Bertuch, who found "nothing" and, in turn, referred plaintiff to Dr. Genovese, a neurosurgeon. Dr. Genovese found no cause for plaintiff's pain, and referred plaintiff for physical therapy. (T. 23).

The ALJ noted that Dr. Diamond's opinions were inconsistent with the opinions of Dr. Nicholas P. Teresi, M.D.,[3] who found that plaintiff had only a "mild," partial disability and Dr. Joseph J. Fay, M.D.,[4] who also found a "mild" partial disability of the thoracic spine. (T. 18-23). It was not until 2009 that an EMG and nerve conduction study revealed that plaintiff suffered from peripheral neuropathy involving the right upper extremity nerve and moderately severe carpal tunnel syndrome. (T. 21-22) (citing Ex. B4F).

The ALJ found that plaintiff could not perform his prior work, but could perform sedentary work, with additional limitations. Based on the finding that plaintiff would have to change positions at will, the ALJ called a VE to testify at the hearing. In response to various hypothetical questions, the VE testified that there were jobs in the national economy that a person with plaintiff's limitations could perform. (T. 24-25). Because the VE had considered a different geographical region than the one in which

---

[3] Dr. Teresi's area of practice is Occupational Medicine. (T. 223).

[4] Dr. Fay is an orthopedic surgeon. (T. 213).

plaintiff resided, the ALJ asked the VE to supplement his findings. The VE reported that, considering the correct geographical region, the plaintiff would still have the ability to perform substantial gainful activity. (*Id.*) Plaintiff's counsel was allowed to object in writing to the new information from the VE. Notwithstanding the plaintiff's objections, and his request for a supplemental hearing, the ALJ issued her decision denying benefits. (T. 25). In her opinion, the ALJ denied plaintiff's request for a supplemental hearing because the source of the VE's numbers (of jobs available in the relevant region that plaintiff could perform) was "abundantly clear from the [VE's] statement" and "additionally, the numbers for the National Economy do not change." (T. 25). Plaintiff then submitted additional evidence to the AC, but the AC denied plaintiff's request for review.

## VI. **TREATING PHYSICIAN/RFC/CREDIBILITY**

### A. **Legal Standards**

#### 1. **Treating Physician**

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own

judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). The treating physician rule applies to the Appeals Council. *See, e.g., Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (the Appeals Council has an obligation to explain the weight it gave to the opinions of the plaintiff's treating doctors); *Barnwell v. Colvin*, No. 13 Civ. 3683, 2014 WL 4678259 at *15 (S.D.N.Y. Sept. 19, 2014); *Knepple-Hodyno v. Astrue*, No. 11-CV-443, 2012 WL 3930442 at *9 (E.D.N.Y. Sept. 10, 2012).

## 2.    RFC

Residual functional capacity ("RFC") is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia, Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be

established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 3. Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (citation omitted). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the

claimant's capacity to work. 20 C.F.R. §§ 404.1529(c), 416.929(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### B.    Application

#### 1.    Treating Physician

Plaintiff testified that Dr. Diamond has been treating him since 1989. (T. 45). Dr. Diamond examined plaintiff every few months, and consistently stated in the sections of his report, titled "Comp. Follow Up," that plaintiff is "totally disabled" or "permanently disabled." (*See e.g.* T. 224 (3/13/96), 225, 465 (4/25/97), 229 (9/8/95), 231 (8/1/94), 233 (3/25/94), 236 (10/15/93 & 12/2/93), 444 (10/8/04), 445 (5/25/04), 447 (12/3/03), 448 (6/20/03), 452 (8/29/02), 460 (11/1/99), 462 (7/22/98), 404 (10/26/11)). Substantial evidence supports the ALJ's finding that this treating

physician's opinions were entitled to no weight.[5]

On April 20, 2012, Dr. Diamond completed a "Medical Source Statement" form clearly relating to plaintiff's condition at that time. (T. 409-414). In this form, Dr. Diamond placed checks in boxes, indicating that plaintiff could only occasionally[6] lift and carry only up to 10 pounds; could only sit for two hours, stand for five minutes, and walk for thirty minutes at one time, for a total of three hours of sitting, one hour of standing, and two hours of walking in an eight-hour day. (T. 410). Dr. Diamond also stated that plaintiff could not work because he would have to "lay down at intervals." He stated that plaintiff occasionally needs the use of a cane to ambulate, and that the cane was "medically necessary at times." (T. 410). Plaintiff could only walk one half of a mile without the cane.[7] (Id.) Plaintiff could "never" push or pull, but could "occasionally" reach (overhead and all other reaching), handle, finger, and feel. (T. 411). Dr. Diamond stated that these limitations were due to chronic bilateral ulnar neuropathy; chronic renal insufficiency; extensive degenerative disc disease of the

---

[5] It is clear that most of Dr. Diamond's reports that repeat the phrase "totally disabled" are preceded by the term "COMP. F/U," indicating that they were written for Workers' Compensation. Workers' compensation has different standards for disability than DIB standards, and a finding or opinion relating to a workers' compensation case is not dispositive in a Social Security disability case. *See, e.g., Gray v. Chater*, 903 F. Supp. 293, 299 & n.7, 310 & n.8 (N.D.N.Y.1995) (collecting cases). Moreover, the ultimate determination of whether a plaintiff is disabled or "unable to work is reserved to the Commissioner. *Credle v. Astrue*, No. 10-CV-5624, 2012 WL 4174889, at *17 (E.D.N.Y. Sept. 19, 2012) (citing 20 C.F.R. § 404.1527(d)).

[6] Occasionally is defined as "up to 1/3" of the day. (T. 409).

[7] Dr. Diamond's statement is unclear. The question on the form reads: "How far can the individual ambulate without the use of a cane?" (T. 410). The doctor's exact response was: "½ mile if not with back pain." (Id.)

spine; and an old fracture of the radial head with chronic decrease in range of motion of the elbow and forearm. (*Id.*) Because of his diabetic neuropathy, plaintiff could never use his feet to operate foot controls. (*Id.*)

The form also stated that plaintiff could occasionally climb stairs and ramps, could occasionally balance, but could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl. (T. 412). Plaintiff's vision was constantly fluctuating due to his diabetic retinopathy. Plaintiff would be unable to read very small print and could not distinguish small items such as bolts and screws. (*Id.*) Plaintiff could never work with moving mechanical parts or at unprotected heights; but could occasionally work in humid or wet conditions; with dust, odors, or fumes; in extreme temperatures; or with vibrations. Plaintiff could drive a motor vehicle "continuously." (T. 413). Finally, plaintiff could never walk a block at a reasonable pace on rough or uneven surfaces. (T. 414).

The ALJ discussed Dr. Diamond's reports and carefully discounted his opinion of "total" disability, beginning with his letter dated March 13, 1996.[8] In March of 1996, Dr. Diamond wrote that plaintiff was "unable to work and will always be unable

---

[8] The ALJ correctly observed that many of Dr. Diamond's reports were dated after plaintiff's insured status expired. The court notes that plaintiff sustained other injuries, and that his existing impairments worsened, after the expiration of his insured status. (*See e.g.* T. 463 - on 8/1/97, plaintiff had a fracture of his right hip; he had renal failure as the result of his diabetes, and his arthritis became more severe (*compare* T. 257-58) *with* (T. 215-16)). In 1991, plaintiff's CT scan showed only mild bulging of the discs at C3-C4 and C5-C-6, with an "otherwise unremarkable examination. In 1991, a CT of plaintiff's lumbar spine was "essentially negative," with minor central bulging at L3-L4 and L4-L5. (T. 215). In 2009, there was evidence that plaintiff suffered from mild disc disease at C2-C3, C3-C4, C4-C5 and C7-T-1, with moderate to severe disease at C5-C-6 and C6-C-7. (T. 257). By 2009, plaintiff had developed spinal stenosis, which was moderate in spots and severe in spots. (T. 258).

to work," due to his diabetes; peripheral neuropathy (secondary to the diabetes); obesity; and degenerative joint disease. (T. 224). These impairments were causing pain in his neck, his mid, and his low back, with "marked diminished range of motion." (*Id.*) Dr. Diamond also mentioned plaintiff's shoulder impingement and the need for surgery to correct this problem, the numbness in his lower extremities, and pain in his ankles. (*Id.*)

As noted above, the ALJ discounted Dr. Diamond's opinions because they were inconsistent with his own progress notes and inconsistent with contemporaneous medical evidence from consulting specialists. (T. 19-23). Instead, the ALJ gave great weight to the reports of Dr. Teresi and Dr. Fay, who both opined that plaintiff had a "mild disability" prior to the expiration of his insured date. (T. 20). While Dr. Diamond's March 1996 report mentions that plaintiff had shoulder pain that might require surgery, by May 29, 1996, Dr. Diamond stated that plaintiff's shoulder "actually stabilized," and told plaintiff to wait as long as possible before considering surgery.[9] (T. 227). On June 16, 1993, Dr. Diamond stated that plaintiff's back was "stiff," but that he was walking two miles per day.[10] (T. 23). February 22, 1994, after plaintiff alleged that his disability began, Dr. Diamond noted that plaintiff "slipped while shoveling a neighbor's ice," and that he had pain as a result. (T. 233). However, shoveling ice is not consistent with the degree of restriction that Dr. Diamond set forth in his reports.

_____

[9] Plaintiff never subsequently needed, or had surgery on his shoulder.

[10] In October of 2002, Dr. Diamond stated that plaintiff had been walking daily, "he says about several miles." (T. 451). This is certainly inconsistent with Dr. Diamond's statements that plaintiff was unable even to walk one block without pain.

The ALJ cited Dr. Diamond's reports indicating that plaintiff was a volunteer firefighter in 2006 and in 2009.[11] (T. 19). Additionally, although plaintiff asserted that he wore a back brace "the whole time," the medical records did not support this statement. In fact, on May 30, 1993, Dr. Diamond stated that plaintiff "comes in wearing a back brace," but there was no indication that the brace was medically necessary, and it appears that Dr. Diamond did not prescribe it. (T. 238).

Dr. Fay's and Dr. Teresi's reports were both written after plaintiff's 1991 accident in connection with his Workers' Compensation claim, but prior to plaintiff's onset date of May 19, 1993. Dr. Fay stated that x-rays taken at the hospital in 1991, showed mild to moderate degenerative spondylosis of the dorsal spine with osteophyte formation at T11-T12. (T. 213). Dr. Fay interpreted an August 12, 1991 bone scan as "within normal limits." Dr. Fay stated that plaintiff weighed three hundred pounds, but he ambulated around the office without difficulty and did not have an antalgic gait. Plaintiff showed no obvious signs of muscle spasm, had essentially normal lumbar lordosis while standing, and displayed the "normal" loss of lordosis with forward flexion. He had essentially normal extension and tilting from side to side, but was complaining of pain with those motions. (*Id.*) Plaintiff's gluteal muscles were strong

---

[11] Dr. Diamond's notes show that when plaintiff was alleging disability, even after the expiration of his insured date, he was engaging in activities that were inconsistent with severe restrictions. On August 4, 2001, plaintiff complained to Dr. Diamond that he had right wrist and hand pain for "several days." (T. 456). Dr. Diamond stated that plaintiff denied any history of trauma, but plaintiff had "been quite active with his grand kids bouncing around on the trampoline, doing a lot of work he may have hit it and not realized it." (*Id.*) On March 28, 2005, plaintiff asked for a "note that he can continue w/ his fire police duties because of his blood pressure being ↑." (T. 441). Fire police duties are not consistent with severe physical restrictions. On January 10, 2005, plaintiff told Dr. Diamond that he hurt his wrist because he had been "lifting some snow." (T. 444).

and straight leg raising was negative to 80 degrees. (T. 214). X-rays of the lumbar spine were "quite clean." (T. 214). In summary, Dr. Fay found that plaintiff suffered a temporary aggravation of a pre-existing arthritic condition, but only had a mild partial disability to the thoracic spine related to pre-existing degenerative arthritis. (*Id.*) Dr. Fay stated that "[a]s far as returning to work, I will leave that up to Dr. Diamond and Dr. Beruch." (*Id.*)

In April of 1992, plaintiff was examined by Dr. Nicholas Teresi. (T. 220-23). Dr. Teresi mentioned that plaintiff had been examined by Dr. Bertuch[12], who referred plaintiff to Dr. Genovese on September 3, 1991. (T. 220). He was examined by Dr. Genovese on November 11, 1991, "and his report indicates that he did not know what was causing the pain and he did not think that any surgical lesions were present." (*Id.*) Dr. Teresi mentioned the "essentially negative" myelogram that was performed on October 30, 1991. (T. 220).

Plaintiff told Dr. Teresi that his lower back bothered him when he sat for more than one hour. (T. 221). There was also a tingling feeling in his arms which extended into his fingers. Dr. Teresi's physical examination revealed a very obese 38 year old man who did not appear to be acutely or chronically ill. He walked with a slight limp, but there was no spasm or rigidity in the cervical muscles. There was mild restriction on plaintiff's extension, lateral flexion, and lateral rotation, but no restriction on flexion. Dr. Teresi found nothing abnormal in plaintiff's upper extremities and no

---

[12] Dr. Teresi's report mentions Dr. Bertuch and Dr. Genovese, but the actual reports written by these two physicians are not in the record. Dr. Teresi stated their findings.

tenderness. There was no spasm in the lumbar muscles, but plaintiff had moderate restriction on flexion, due to his obesity, not his back. (T. 222). Dr. Teresi opined that plaintiff had a mild partial disability due to his back condition. (*Id.*) He suggested weight loss, and stated that plaintiff's back would probably not improve without weight loss. (*Id.*)

Plaintiff argues that Dr. Diamond's reports, indicating that plaintiff is totally disabled, are consistent with Dr. Fay's and Dr. Teresi's reports. However, Dr. Fay and Teresi found only a mild permanent disability, not the "total disability" that Dr. Diamond consistently reported in his notes. Plaintiff also argues that Dr. Diamond's reports are consistent with those of Dr. John Ioia, M.D., an orthopedic surgeon. It is up to the ALJ to resolve conflicts in the evidence, and this court finds that the ALJ did not err in finding that Dr. Ioia's report was consistent with plaintiff's ability to perform some level of activity during the insured period.

On June 10, 2011, Dr. Ioia wrote a letter, stating that plaintiff was under his care for "issues related to severe chronic osteoarthritis of the cervical spine with superimposed whiplash injury to the cervical spine and difficulties with upper extremity function." (T. 279). Dr. Ioia also mentioned plaintiff's other impairments, some of which were not diagnosed prior to the expiration of his insured status in 1996, such as renal failure and plaintiff's broken wrist, with alteration of the range of motion of his elbow and evidence of significant ulnar nerve palsy to his right dominant arm. (*Id.*) Dr. Ioia stated that "[a]s such, this individual is not a candidate for performing any labor" and found that he could not perform any of "the activities of work that he historically

performed." (*Id.*)  Dr. Ioia also stated that plaintiff was "only a candidate for the most sedentary of activities and therefore in my opinion is a good candidate for disability." (*Id.*)

Dr. Ioia concluded that plaintiff could not return to his previous work.  In making this determination, he was considering plaintiff's 2011 condition.  There is no indication in the letter of June 10, 2011, that Dr. Ioia was making a retrospective determination, because he mentioned impairments that were not diagnosed until after the expiration of plaintiff's last insured date, including those that occurred because of an subsequent injury.  Even based upon plaintiff's additional and worsening impairments, Dr. Ioia stated that plaintiff could engage in the "most sedentary" of activities.  It was then up to the ALJ to determine what activities plaintiff could have performed and whether those activities would rise to the level of substantial gainful activities.[13]  The ALJ did this by determining plaintiff's RFC, based upon the medical records, plaintiff's testimony, and the VE, as discussed below.

## 2.      RFC/Obesity/Credibility

Although plaintiff argues that the ALJ found he was able to do "light" work prior to June of 1996, the ALJ did not make that finding. (T. 18).  In fact, the ALJ made specific findings regarding plaintiff's physical abilities that spanned both light and sedentary work, but were more comparable to sedentary work, other than the lifting requirement.  Specifically, the ALJ found that plaintiff could lift and/or carry up to 20

---

[13] Dr. Ioia wrote a new letter, dated September 12, 2012, after he examined plaintiff on August 27, 2012. (T. 466-68).  As discussed below, plaintiff submitted Dr. Ioia's new letter to the AC for its consideration as "new and material evidence" under 20 C.F.R. § 404.970(b).

pounds occasionally and 10 pounds frequently. (T. 18). Plaintiff had the ability to stand and/or walk four hours total and sit for six hours total in an eight-hour work day, but required the ability to sit or stand alternately, at will, provided he was not off task more than 10% of the work period. He could never climb ladders, ropes, or scaffolds. He could occasionally climb ramps or stairs and occasionally stoop, crouch, kneel, or crawl. (*Id*.) The ability to perform a full-range of "light" work requires the ability to stand and/or walk for a total of six hours, not four as found by the ALJ. *See* SSR 83-10, 1983 WL 31251, at *5 (1983).

There are no RFC evaluations in the record which were completed prior to the expiration of plaintiff's insured status.[14] In making her RFC determination, the ALJ considered the doctors' reports and plaintiff's credibility regarding his physical abilities. The ALJ noted that many of Dr. Diamond's reports post-dated the expiration of plaintiff's insured status. (T. 19). The ALJ found that a great deal of Dr. Diamond's assessments were based solely upon the plaintiff's complaints of pain, rather than upon the clinical evidence, which, prior to the expiration of plaintiff's insured status, showed essentially mild degenerative changes. It was not until 2009, that the updated MRI reports showed much more serious changes. In fact, as stated above, in 1991 and 1992, the objective evidence was "essentially negative."

---

[14] Dr. Diamond's RFC evaluation is dated April 20, 2012. (T. 409-414). Dr. Diamond's reports, prior to June 30, 2006, state that plaintiff is "totally disabled," but those reports do not make estimates of the plaintiff's RFC. Moreover, it is clear that most of the reports that repeat the phrase "totally disabled" are preceded by the term "COMP. F/U," indicating that they were written for Workers' Compensation, which, as noted above, has different standards for disability than DIB standards.

More importantly, as discussed above, the ALJ focused upon plaintiff's statements about shoveling a neighbor's ice in 1994,[15] while he claimed to be "totally disabled," and his statements to Dr. Diamond in 2006 and 2009 (long after his alleged onset date), implying that plaintiff was a volunteer firefighter or had "fire police" duties, for which he had to be cleared by physical examination. (*See* T. 441 - plaintiff asking for a note on March 28, 2005, stating that he can "continue" his fire police duties because his blood pressure was elevated). When plaintiff asked for a note[16] which would allow him to continue his fire police duties, there was no mention in the report that back pain might impede those duties. On March 27, 2006, the first section of Dr. Diamond's report stated: "COMP F/U: Mid and low back pain secondary to chronic strain and DJD. He's permanently disabled. . . . Exam is unchanged, neurologic exam is normal he remains permanently disabled." (T. 438). However, in the next (and separate) section of the same report, Dr. Diamond states: "F/U: EKG done as an outside firefighter physical was normal. . . . continue diet and exercise and I'll see him in 3 months." (T. 438). On March 24, 2009, Dr. Diamond stated that "[plaintiff] brings in an EKG from the firehouse where he is a volunteer and this looks okay." (T. 418).

---

[15] The court notes that the ALJ made a typographical error in her decision with respect to the date that plaintiff told Dr. Diamond that he was shoveling "ice." (T. 19). In her decision, the ALJ says that it was August 22, 1994 (T. 19); however, the medical records confirm that the date that plaintiff got hurt shoveling "ice" was **February** 22, 1994 (T. 233). The mistake may have been made because the handwritten "2" in the date on the medical record looks like an "8." (*Id.*) Any error in the ALJ's decision is harmless. Clearly the medical records confirm that plaintiff was shoveling ice for a neighbor in February.

[16] It is unclear who wrote the note describing plaintiff's request. It is handwritten. However, the import of the note is that plaintiff implied to the writer of the note that he wished to "continue" his "fire police" duties.

At the hearing plaintiff testified that prior to the expiration of his insured status, he could only sit for approximately twenty to thirty minutes and stand and/or walk for ten to fifteen minutes at a time. (T. 39-40). However, the ALJ discussed Dr. Diamond's June 16, 1993 report, which cited plaintiff's statement that he was still stiff, but was walking "2 miles per day."[17] (T. 20) (citing T. 237). On October 2, 2002, plaintiff told Dr. Diamond that he was walking daily, "he says about several miles." (T. 451). Walking "several miles" per day would certainly take more than ten to fifteen minutes, and even walking two miles per day would take longer than ten to fifteen minutes.

Although plaintiff testified that he could only sit for twenty to thirty minutes at a time (T. 39), there was no evidence of sitting limitations during the insured period. The ALJ properly rejected plaintiff's credibility with respect the estimate of the length of time plaintiff could sit. Dr. Ioia did not mention that plaintiff had any limitations for sitting and concluded, presumably as of the date of his report in 2011–when plaintiff's physical limitations were worse than in the 1990s–that plaintiff was capable "of the most sedentary of activities." (T. 279). The ALJ also took plaintiff's need to alternate standing and sitting into account when determining his RFC. Thus, the ALJ's finding that plaintiff could sit for a total of six hours and walk a total of four hours in an eight hour work day prior to the expiration of his insured status is supported by substantial evidence in the record.

Plaintiff also testified that in 1996, he needed help taking care of his personal

---

[17] Although neither party mentions it, Dr. Diamond's June 16, 1993 progress note also indicates that plaintiff was "refused Social Security disability." (T. 237). In this case, plaintiff alleges that his disability began on May 19, 1993.

needs because sometimes his hands would not "work," due to "arthritis." (T. 38). He stated that Dr. Diamond was treating this problem (*Id.*); but, there is no mention of any complaints of arthritis in his hands until after 1996. Dr. Diamond's reports from 1996 to 1997 mention plaintiff's back, his shoulder problem, his diabetes and diabetic neuropathy in his feet, and his blurred vision, but no arthritis in his hands.[18] (*See e.g.* T. 225-27). In fact, on November 6, 1996, Dr. Diamond stated that plaintiff's "vision is overall better and he has less burning in his feet." (T. 225). The ALJ was entitled to consider these inconsistencies, in rejecting the treating physician's assessment of plaintiff's capabilities, in rejecting plaintiff's credibility regarding his allegations of disabling pain, and in determining the plaintiff's RFC.[19]

Plaintiff argues that the ALJ failed to adequately consider his obesity when determining plaintiff's RFC. However, as noted above, the ALJ explicitly discussed plaintiff's obesity and found that it did not cause any work-related limitations, citing SSR 02-1p. (T. 18).[20] In any event, *Drake v. Astrue*, 443 F. App'x 653, 657 (2d Cir.

---

[18] On October 20, 1995, Dr. Diamond stated that plaintiff "occasionally gets a nonspecific tingling of his fingers," which Dr. Diamond believed may have been related to his peripheral neuropathic problem. (T. 228). There was no problem that would cause the restrictions to which plaintiff testified. In addition, plaintiff's statement in February of 1994 that he was shoveling snow is inconsistent with having such severe pain in his hands that he needed help buttoning his shirt and tying his shoes.

[19] The court must note that there is no question that plaintiff had diminished ranges of motion. However, it is clear that the ALJ was entitled to find that the degree to which plaintiff was restricted prior to the expiration of his insured date was exaggerated, and his RFC finding is supported by substantial evidence.

[20] Plaintiff argues that the ALJ failed to consider whether plaintiff's obesity met the "previously listed impairment at 20 C.F.R. § 404, subpart P, appendix A § 9.09." (Pl.'s Br. at 18). Plaintiff states that this listing should have been considered because it was in effect in 1996, when plaintiff's insured date expired. (*Id.*) As of October 25, 1999, the Commissioner deleted section 9.09 as a listed

24

2011), makes clear that an "ALJ implicitly factor[s] a claimant's obesity into his RFC determination by relying on medical reports that repeatedly noted [the claimant's] obesity and provided an overall assessment of her work-related limitations." The same is true in this case. All the physicians who examined plaintiff for physical impairments mentioned his obesity. For example, the ALJ relied upon Dr. Teresi's opinion, and the doctor commented on plaintiff's obesity, so the ALJ essentially factored in plaintiff's obesity by considering Dr. Teresi's report.

Dr. Teresi's report stated that plaintiff's obesity, when considered in combination with his mild to moderate degenerative disc disease of the dorsal and lumbar spine and diabetes caused a permanent partial disability which was materially and substantially greater than that which was caused by his work-related (mid and low back) injury alone." (T. 223). Dr. Teresi's comment does not change this court's analysis with respect to plaintiff's obesity. Dr. Teresi stated that plaintiff had a "mild partial disability due to his back condition per se."[21] (T. 222). He also stated that marked weight reduction would be of great benefit, and the back condition would not "improve

---

impairment. SSR 02-1p, 2002 WL 34686281 (2002). In SSR-02-1p, the agency noted that "the criteria in listing 9.09 did not represent a degree of functional limitation that would prevent an individual from engaging in any gainful activity." *Id.* at *1. Changes were made to other listed impairments to ensure that obesity was still addressed. *Id.* The SSR also explicitly provides that the new rules apply to claims that "were filed before October 29, 1999, and that were awaiting an initial determination or that were pending appeal at any level of the administrative review process or that had been appealed to court. The change affected the entire claim, including the period before October 25, 1999." *Id.* at *7. This plaintiff's case was filed in 2011, thus, listing 9.09 definitely does not apply, notwithstanding that plaintiff is alleging disability for a time when the listing was in effect.

[21] Dr. Teresi was examining plaintiff for Workers' Compensation, so it is not unusual that Dr. Teresi would be discussing plaintiff's obesity separately in combination with the back injury that was work-related.

without a great deal of weight loss." (T. 222). Notwithstanding these comments, Dr. Teresi found that plaintiff had no spasm or rigidity of the cervical muscles, and a mild restriction on extension lateral flexion, and lateral rotation, but no restriction on flexion and no tenderness was present. (T. 221). Curvature of the spine was normal, and there was mild tenderness present in the upper and mid dorsal spine as well as the lumbosacral region. (T. 221-22). There was no spasm or rigidity of the lumbar muscles, and although there was moderate restriction on flexion, some of the restriction was due to his obesity and not his back pain. There was a mild defect on extension of the spine, but no atrophy of the lower extremities. (T. 222). Dr. Teresi's comment that the permanent partial disability caused by all of plaintiff's impairments was greater than that which would have occurred subsequent to the 1991 injury alone does not indicate that plaintiff was totally disabled. Dr. Teresi's statement implies that plaintiff was more limited because of the combination of his impairments, including his obesity. There is no question that plaintiff's diabetes and his obesity contributed to his RFC determination, but the ALJ did consider the combination of all plaintiff's impairments in making that determination.[22]

Because the ALJ found specific limitations that did not apply exactly to one exertional category, he used a VE at the hearing to determine whether plaintiff could perform substantial gainful activity in the national economy. Plaintiff also challenges the VE's determination as discussed below.

---

[22] The ALJ also noted that plaintiff was not claiming disability as a result of his obesity, nor did the record document any work-related limitations based on his obesity. (T. 21).

## VII. VE and SUPPLEMENTAL HEARING REQUEST

### A. Legal Standards

At step five of the disability analysis, the burden shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). "Work which exists in the national economy" means work existing in significant numbers "either in the region where the individuals live or in several regions of the country." *McCusker v. Comm'r of Soc. Sec.*, No. 1:13-CV-1074, 2014 WL 6610025, at *3 (N.D.N.Y. Nov. 20, 2014) (quoting SSR 82-53, 1982 WL 3134, at *3 (1982) (internal quotation marks removed). This definition emphasizes "that . . . a type[] of job which exists only in very limited numbers or in relatively few geographic locations may not be said to 'exist in the national economy.'" *Id.* However, what constitutes a "significant" number is "fairly minimal." *Id.* (quoting *Fox v. Comm'r of Soc. Sec.*, No. 6:02-CV-1160, 2009 WL 367628, at *20 (N.D.N.Y. Feb. 13, 2009)).

In the ordinary case, the ALJ carries out the fifth step by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). But if plaintiff has non-exertional impairments or other impairments that "significantly limit the range of work" permitted by his exertional impairments, the ALJ may be required to consult a vocational expert ("VE"). *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986).

### B. Application

In this case, because the plaintiff had impairments which would have affected his

ability to perform some of the activities required by both light and sedentary work, the ALJ consulted a VE. At the hearing, the ALJ posed four hypothetical questions. (T. 56-60). The first hypothetical assumed the RFC stated above, without the sit/stand option, and the VE testified that although such an individual would not be able to perform his previous work, there were jobs that he could perform, such as a scale operator, table worker, or assembler. (T. 57). Each of those jobs was classified as sedentary. (*Id.*) The VE testified that there were 17,000 scale operator jobs in the national economy, 500 in New York State, and 100 in the "regional" economy; there were in excess of 200,000 assembler jobs in the national economy, 3,000 in New York, and 180 in the "region;" and there were 300,000 table worker jobs in the national economy, 18,000 in New York, and 700 in the "region." (T. 57-58).

The second hypothetical assumed all of the limitations from the first hypothetical and added that the individual would be required "to sit or stand alternatively at will, provided [he is] not off task more than 10 percent of the work period." (T. 59). The individual could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs, and could occasionally stoop, crouch, kneel, or crawl. The VE stated that notwithstanding the additional restrictions, the first three jobs he mentioned would still be available. *Id.*

The third hypothetical added a further restriction that the individual could only "less than occasionally" climb ramps or stairs, and could "less than occasionally" stoop, crouch, kneel, or crawl. (T. 59). Again, the VE stated that the first three jobs would be appropriate. (T. 59-60). Finally, the ALJ asked the VE to assume that the previous

individual was also limited in his ability to perform frequent handling and fingering. (T. 60). The VE stated that the individual would still be able to perform the jobs mentioned above. (T. 60).

As the plaintiff's counsel questioned the VE, it became apparent that the VE used the incorrect "regional economy" numbers. (T. 62-64). The VE did not have the numbers for plaintiff's region at the hearing. (T. 64). The ALJ asked the VE to submit the numbers "post hearing," and plaintiff's counsel asked whether he could "preserve [his] right to further cross-examine the Vocational Expert." (T. 65). The ALJ stated that the VE was only going to produce numbers from the correct region. (T. 68). Counsel insisted that he wished to preserve his "right," and the ALJ agreed. (T. 68).

On May 8, 2012, the VE submitted the replacement numbers. (T. 205). The numbers for plaintiff's region actually increased for each job mentioned by the VE. There were 30 additional Scale Operator jobs; 150 additional table worker jobs; and 110 additional assembler jobs. (*Id.*) The VE pointed out that the national and New York numbers would stay the same. (*Id.*) Plaintiff's counsel was given an opportunity to comment on the evidence. On May 16, 2012, counsel requested a further hearing to "examine the consultant based upon his written submission." (*Id.*)

The ALJ did not give counsel the opportunity for a "supplemental hearing," denying the request in her written decision. (T. 25). The ALJ stated that she was denying counsel's request "to cross-examine the vocational expert regarding the source of the numbers for the regional economy, as it is abundantly clear from the vocational expert's statement, and additionally, the numbers for the National Economy do not

change." (*Id.*)  The ALJ also pointed out that the Commissioner considers that work exists in significant numbers in the national economy when "it exists in significant numbers either in the region where you live or in several other regions of the country. It does not matter whether work exists in the immediate area in which you live, a specific job vacancy exists for you, or you would be hired if you applied for such work." (*Id.*)

Plaintiff argues that due process requires that the ALJ grant plaintiff a supplemental hearing.  In *McCusker*, Chief Judge Gary L. Sharpe stated that the regulations specifically state that it does not matter if work exists in the immediate area in which a plaintiff lives. 2014 WL 6610025, at *3 (citing 20 C.F.R. § 404.1566 (a)(1)). In *Colon v. Comm'r of Soc. Sec.*, No. 6:00-CV-556, 2004 WL 1144059, at *8 (N.D.N.Y. Mar. 22, 2004), the ALJ relied only on the "national job" information in his decision denying benefits.  The plaintiff argued that those jobs were not available in the regional economy, and Judge Suddaby held that "the truth of that assertion is irrelevant because it fails to consider the proper standard." *Id.*  It did not matter whether the jobs were available in plaintiff's region if the national numbers were significant.

Although a claim of entitlement to social security benefits triggers Due Process protections, what constitutes adequate due process in the Social Security context differs from that applied to a judicial trial. *Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996).  The ALJ ultimately has discretion over the conduct of the hearings, and evidentiary rules do not apply. *See Carpenter v. Colvin*, No. 5:13-CV-859, 2014 WL 4637085, at *2 (N.D.N.Y. Sept. 16, 2014) (citations omitted).  In *Carpenter*, the ALJ refused to

postpone a hearing, and as a result failed to take the plaintiff's testimony. *Id.* at *1-2. The court held that plaintiff's due process was not violated, and she was not entitled to a supplemental hearing. *Id.* at 3. The court found that "[n]otably, Carpenter fails to show that the presentation of her case would have improved if . . . she received a supplemental hearing." *Id.*

The same is true in this case. The plaintiff was not entitled to a supplemental hearing. Plaintiff had her hearing, and as the ALJ stated, there would have been no reason for counsel to "challenge" the regional numbers. The national numbers stayed the same, and the ALJ could have made her decision based on the national and New York numbers alone. Plaintiff's counsel recognizes that the plaintiff's right is not "absolute" and cites *Flatford v. Chater*, 93 F.3d 1296, 1305-1306 (6th Cir. 1996) for the proposition that the plaintiff's hearing must be "full and fair." (Pl.'s Br. at 15). However, the court in *Flatford* held that "due process does not require the Commissioner to allow a social security claimant upon request to cross-examine every physician providing post-hearing evidence in order for the hearing to be 'full and fair.'" *Id.* at 1305. If this is true for physician testimony, it is equally true for a VE's testimony, particularly when the VE has already testified.

In this case, plaintiff cannot succeed in arguing that the ALJ denied him due process by failing to grant a supplemental hearing only to ask the VE about numbers that he submitted for a different regional economy, particularly because the national numbers and the New York State numbers did not change. Plaintiff had the opportunity to cross-examine the VE at the hearing, and plaintiff received a full and fair hearing. A

supplemental hearing would have been pointless and would not have changed the ALJ's decision. Thus, the ALJ did not err in failing to grant plaintiff a supplemental hearing. *See also Yancey v. Apfel*, 145 F.3d 106 (2d Cir. 1998) (agreeing that the requirements of due process are satisfied by providing the claimant the opportunity to cross-examine a reporting physician where reasonably necessary to a full development of the evidence).

## VIII.  "NEW AND MATERIAL" EVIDENCE

### A.    Legal Standards

The regulations provide that the Appeals Council considers new and material evidence if it relates to the period on or before the date of the ALJ's decision. 20 C.F.R. § 404.976(b)(1). *See Jenkins v. Colvin*, No. 1:13-CV-1035, 2015 WL 729691, at *5 (N.D.N.Y. Feb. 19, 2015) (citation omitted).  If the Appeals Council finds that the evidence is new and material, it will review the case if it finds that the ALJ's decision is contrary to the weight of the current record evidence. *Id.* (citing 20 C.F.R. § 404.970 (b).  Even if the Appeals Council finds that the evidence is not new and material and declines to review the ALJ's decision, the evidence in question becomes part of the record for review by the court. *Id.* (citing *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996).  If the Appeals Council denies review after reviewing the new evidence, the Commissioner's decision includes the AC's conclusion that the ALJ's findings remain correct despite the new evidence. *Id.*

### B.    Application

Plaintiff argues that the AC erred in failing to find that Dr. Ioia's letter, dated

September 12, 2012 (T. 466-68), was new and material evidence, sufficient to reevaluate the ALJ's determination. Dr. Ioia's new letter was considered by the AC, but the AC found that Dr. Ioia's letter would not have changed the ALJ's findings. The AC did not specify its reasons, it only provided a summary denial of the request for review, noting that it considered the additional evidence. (T. 1-2).

This court agrees that the AC's decision was supported by substantial evidence. Dr. Ioia's prior letter, which was before the ALJ, is clearly a summary of plaintiff's impairments as of 2011, when the letter was written. (T. 279). Although Dr. Ioia states that plaintiff had been "under his care," there is no indication of how long this doctor treated plaintiff, and the short 2011 letter was the only piece of evidence in the record from Dr. Ioia. In that letter, he stated that plaintiff was "a candidate for the most sedentary activities." (*Id.*)

The letter supplied to the AC was written after Dr. Ioia reexamined plaintiff on August 27, 2012. (T. 466-68). Although Dr. Ioia stated that plaintiff's "problems go back to 1991," the doctor understandably considered plaintiff's condition as it was in 2012. Dr. Ioia also stated that in 1991, plaintiff would have been unable to "lift, carry or do all of the activities that he had in his work," a statement that is not disputed by the Commissioner. (T. 466). Although Dr. Ioia stated that plaintiff could not perform the duties about his home in the 1990s, that statement is not supported by the other evidence of record regarding plaintiff's physical activities during and after the insured period. Dr. Ioia then reviewed plaintiff's current condition, in which the complications of plaintiff's diabetes have gotten worse.

Dr. Ioia reviewed all the evidence and stated that plaintiff was currently totally disabled from any type of work, and asked the Social Security Administration to "look favorable [sic] on this gentleman who is simply not capable of work duties." (T. 467-68). Dr. Ioia then states that "[i]nterestingly the request was made to determine whether Donald was disabled as far back as 1991." (T. 468). Dr. Ioia stated that he had no direct information regarding how the claims were managed "at the time," but it was clear that plaintiff could not have performed "any labor at that time . . . . any lifting, pushing, pulling, bending, stooping, once again, any of the activities expected of his work." (*Id.*) Dr. Ioia then states "[i]t is purely conjecture that he could perform some seated work." (*Id.*)

Based on examinations in 2011 and 2012, Dr. Ioia opined that, as of the 1990s, plaintiff could not perform his prior work, which the ALJ also concluded. While Dr. Ioia's 2012 letter is somewhat unclear, it appears to say that, based on his recent examinations, he could only offer "conjecture" as to whether plaintiff could do some sedentary work during the insured period in the 1990s. However, the Commissioner was required to determine whether plaintiff was able to perform some alternate work in or before 1996. It is the province of the Commissioner to make that determination based on the record and the regulations The AC's decision not to send Dr. Ioia's 2012 report back to the ALJ was supported by substantial evidence because the new report offered no definitive evidence with respect to plaintiff's ability to perform alternate, sedentary work during the relevant time period in the 1990s.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  February 26, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge